MERCHANTS' WHARFBOAT ASSOCIATION *v.* WM. WOOD & CO,

1. WHARFBOAT ASSOCIATION. *Transaction of business on Sunday. Section 2949, Code of 1880, applied.*

Section 2949, Code of 1880, prohibits the transaction of secular business in this State on Sunday and contains a proviso "that nothing in this section shall apply to railroads or steamboat navigation in this State" *Held*, that the business of a wharfboat association is included in the above proviso.

2. SAME. *Transaction of business on Sunday. Liability for act or omission on that day.*

Such wharfboat association is not bound to transact business on Sunday because by statute it is permitted so to do ; but if it is its custom to transact its business on that day, it cannot escape liability for a failure or neglect to carry on its business properly because the act or omission complained of occurred on Sunday.

3. WAREHOUSEMAN. *Railroad company. Agency. Negligence. Contributory negligence. Case in judgment.*

W. shipped his cotton to N. O. by a railroad company, taking a through bill of lading. The railroad company, a warehouseman, and a steamboat company had a general contract by which the railroad should receive cotton from shippers and deliver the same to the warehouseman, who should hold the cotton till the arrival of the steamboat and then deliver it to such boat to be carried to N. O. W. knew nothing of this contract between the carriers and warehouseman. *Held*, that the railroad company was not such an agent of the shipper, W., as that it could make a contract with the warehouseman in reference to the cotton so shipped by W. which would relieve such warehouseman from the consequences of his own negligence or bind W. by any contributory negligence on the part of the railroad company.

4. SAME. *Failure to ship cotton on first opportunity. Loss by fire. Liability for damage.*

In the case above stated the cotton was burned while in the hands of the warehouseman, who had failed to ship the same by the first boat departing for

N. O., but had awaited the departure of the boat with which he had the general contract above alluded to. *Held*, that ordinarily the warehouseman had a right so to do, but if he, as a man of ordinary prudence, were admonished by the surrounding circumstances of the danger from fire to which the cotton was exposed, it was his duty to ship out the same by the first opportunity, and he was guilty of negligence if he failed to do so.

5. WAREHOUSEMAN.  *Damages resulting from negligence.  Remote and proximate causes.*

But if in such case the fire occurred, not from any of the causes which should have reasonably excited apprehension, but from another and distinct source, which neither of itself nor in connection with the other surroundings was a cause of reasonable apprehension of danger from fire, then the warehouseman is not liable for the loss of the cotton, since his negligence was the remote and not the proximate cause thereof.

APPEAL from the Circuit Court of Washington County.

HON. J. H. WYNN, Judge.

The case is stated in the opinion of the court.

*Phelps & Skinner* and *Campbell & Starling*, for the appellant.

1. There is no conflict in the authorities as to the rule of damages—*causa proxima non remota spectatur*—and that it is applicable to actions both in contract and in tort. In both the damage must be the *natural* result of the act or breach, and as to contracts must have been in the contemplation of both parties where most broadly applied, or in tort must have been such as could reasonably have been *foreseen and avoided.*

In actions in tort the adjudications have established a plain, practical criterion to determine what are remote and what are proximate results under the rule, viz. :

Where there is a succession of continuous events, where each is the direct effect of the next preceding one, and thus the last one is traceable back to the negligent act or omission, the damage is held to be proximate.

Where the injury is not produced as above by a succession of connected results reaching back to the negligent act or omission, but is produced concurrently with the negligent act by some intervening, independent, and sufficient direct cause, the damage will be held to be remote. *Milwaukee & St. Paul Ry. Co.* v. *Kellogg,*

94 U. S. 469 ; Cooley on Torts 68 and 77 ; 1 Sutherland on Damages 56 and 57.

The case at bar is a most apt illustration of the latter class. For if it were true that the appellant was either negligent in its custody of the cotton, or violated an implied agreement to ship within a reasonable time, such acts or omission manifestly had no sort of connection, natural or otherwise, with the oil mill fire, which therefore as a new, intervening, and independent cause must be accounted the proximate cause of the loss.

We are entitled to the benefit of this rule unless there is some exception which would entail upon a wharfinger a liability for a failure to exercise a sound discretion in the shipment of property, equal to that of an insurer against all possible loss, even to fire by a stroke of lightning.

It will be observed that the contention of appellee is that while the act complained of may not have been the direct or proximate cause of the loss, that yet it produced the *opportunity* for the loss ; that without it the loss would not have occurred, and appellant should be liable for it. The following authorities repudiate this pretension.

In *Morrison* v. *Davis*, 20 Pa. St. 171, the master of a canal boat was negligent in transporting the goods by starting with a lame horse. The boat was overtaken by an unexpected flood and destroyed. The negligent breach of contract to transport in a reasonable time undoubtedly produced the occasion or opportunity of loss, but it was held *too remote.*

In *Denny* v. *N. Y. C. R. R. Co.*, 13 Gray 481, the carrier was guilty of negligent delay of six days in transporting goods, and while in his depot at destination the goods were destroyed by flood. Had they been carried in time they would not have been destroyed. Held too remote. See also *Daniel* v. *Ballinstein,* 23 Ohio St. 523; *Hoadley* v. *Northern T. Co.*, 115 Mass. 304.

Finally, the case of *Memphis Railroad Co.* v. *Reeves*, 10 Wall. 176, is precisely in point, and the opinion was pronounced by Justice Miller. The defendant had made not an *implied* contract only, but an express contract to start on his voyage at a certain

time. His negligent or willful failure to do so produced the opportunity by which the loss occurred. The court cites the above cases of *Morrison* v. *Davis* and *Denny* v. *R. R. Co.*, and adopts their doctrines expressly as sound rules of law, and says, " It is the third instruction given by the court to the effect that if the defendant had contracted to start with the tobacco the evening before, and if the jury believe if he had done so the train would have escaped injury, then the defendant was liable." The court proceeds to condemn the instruction, because " Even if there had been such a contract the failure to comply would have been only the remote cause of the loss."

We lay stress on these cases, for surely if a common carrier cannot be held for remote losses under the doctrines of public policy so severely applied to them by the law, what shadow of right can the appellee have as against a wharfinger?

An earlier New York case, *Hamilton* v. *McPherson*, 28 N. Y. 76, holding the doctrine we maintain is cited with approval by our own court in *V. & M. R. R. Co.* v. *Ragsdale*, 46 Miss. 480. The carrier had *received notice* to forward grain. He failed to do so and the grain was injured in consequence by heating in the warehouse. It is certain the negligence of the railroad—or more, its *disobedience*—produced the *occasion* of the loss, but the court held it *too remote.* The same case cites with like approval on page 481 *Ashe* v. *DeRoset*, 5 N. C. 301, which was a case of a custodian, a mill-owner, whose negligent delay in hulling rice was the occasion of its being burned in his mill. The damage was also held too remote. These cases express the views of our court in the matter, and in view of all the authorities we believe we have the right to conclude that there is nothing in this case to make it an exception to the general rule against remote damages.

2. The appellee has shifted his ground several times to find some plausible ground for recovery. First, they declare in contract, then abandon the contract and proceed in tort for want of care in the cotton yard, and, lastly, complain because *it was not shipped out of the yard by the Richardson to avoid danger of fire.*

To this we reply: First, that the fact that the cotton was not

destroyed by any of the dangers of the yard complained of is a full answer to such position as a matter of *law*, overriding any conceptions the jury may have formed in the case. Like the stowage of gunpowder in the case *supra*, the loss did not grow out of any such supposed dangers. Second, the railroad company, as agent of the shipper, delivered the cotton on their cars in the yard there to be unloaded and held for shipment, and if the yard was dangerous the appellee should not recover because of W.'s contributory negligence. 24 Am. Dec. 158 ; *Gibson* v. *Hatchett*, 24 Ala. 201.

"So where it is claimed that goods have been injured by stowage in an improper place, the warehouseman may show that the plaintiff himself selected the place." *Brown* v. *Hitchcock*, 128 Vt. 452.

The court will observe that there was no evidence given of any increase of danger between the time the cotton was delivered by the railroad company and its loss.

3. The next defense made by appellant is that the cotton was received under the contract proven, and that it was bound to hold it for the Choteau.

4. Our third defense is that the appellant was not in duty bound to ship on the Sabbath day. And the Richardson, which arrived and departed on Sunday, is the only boat which passed down before the fire.

We ground this defense on two propositions : first, the statute, § 2949, prohibits such labor on Sunday ; second, aside from the statute, a man is not required to discharge secular duties on that day, except possibly in manifest and imminent danger unavoidable by any other means.

*R. B. Campbell* and *W. G. Phelps*, of counsel for the appellant, argued the case orally.

*Leroy Percy*, for the appellees.

1. Appellant sought to avoid the consequences of his negligence in not shipping the cotton on the Richardson by the fact that she arrived and departed from Greenville on Sunday. This position is untenable. The evidence shows that the fact that it was Sunday had nothing to do with the cotton not being shipped, that no such

reason was ever suggested, and that the court was asked to excuse a person for the non-performance of his duty for a reason that had never presented itself to the person himself, that appellant had been in the habit of shipping cotton on that day, and at that very time the boats that he shipped by were due here Saturday or Sunday. So they were at that very time under contract to do what it was unlawful for them to do. According to appellant's theory, if the Choteau and Helena had arrived here all that season on Sunday they need never have shipped a bale of cotton, and not been answerable to the shippers because they were under contract to ship by the Choteau and Helena, and not been answerable to the boats for not complying with their contract because they reached Greenville on Sunday. But it was not unlawful for them to ship cotton on Sunday. Section 2949, Code 1880.

The business of keeping a wharf is as much included in the exception as the business of keeping a railroad depot, for without wharfingers the steamboat business could be no more carried on than the railroad business without depots.

2. The legal principles which govern the case are few and simple, the difficulty, if any there be, laying in the application of them to the facts. Appellant was a wharfinger, a bailee for hire, a bailment *locatio operis faciendi.* His duty was to take reasonable care of the property committed to his care while in his custody, and to use reasonable diligence in the shipment of it, and if he correctly discharges these duties then the loss of the cotton is *damnum absque injuria.* We will consider the liability of appellant for the neglect of this two-fold duty separately. Did he exercise reasonable care in the preservation of the cotton of appellees? If not, was it through the lack of such reasonable care that the cotton was burned? The lack of reasonable care and the loss being occasioned thereby must concur to fix liability upon appellant.

The plaintiff was entitled to expect two things of his paid bailee; first, that he would have taken reasonable care of the cotton before the fire originated, and therefore that it should be at the time the fire originated in such a condition as a prudent man would have had his own cotton in under similar circumstances, and, secondly,

that being in this condition, he would, when the fire originated, exercise that diligence in the preservation and protection of it that a reasonably prudent man would if the property belonged to him. If the yard was in the proper condition, and reasonable diligence would not avail to save the cotton, then no liability could attach to the bailee; but if his efforts to save the cotton were rendered futile and abortive by the dangerously inflammable condition of the yard, resulting from his negligence in the care of it, by the cotton being inextricably mingled with thousands of bales held without reward, by lint cotton being strewn all over the yard, by the utter absence of any fire-preventing or extinguishing appliances such as a reasonable man would have on hand, then it is difficult to divine upon what theory he should not be held answerable for the loss resulting from his negligent custody of the cotton. And now, as to the shipment of the cotton by appellant, was appellant negligent in not shipping appellees' cotton? If so, what were the results of that negligence for which he was answerable, and to what extent is he shielded from such results by the shipping contract entered into by him with the Georgia Pacific Railway Company and the line of boats? And in answering the first query we admit that no special boat being designated, the rule ordinarily is that the wharfinger "is not imperatively bound to accept the first opportunity (of shipment) that offers" (52 Miss. 570); that he probably has the right to make reasonable contracts of affreightment; but the position of appellees is that to have kept their cotton in that yard at that time, aware of the many dangers that environed and threatened it, and not to have extricated it from its perilous situation when a reasonable and convenient opportunity presented itself of doing so, and at the same time forwarding it by a safe boat to its destination, was in itself an act of negligence, was not taking proper care of the cotton committed to his custody; that if under the same circumstances (and this was for the jury to say) a prudent man would have seized with avidity upon the opportunity offered of shipping his own cotton where he desired it to go, and getting it out of a position where it was momentarily in danger, then appellant should not have taken less care of property intrusted

to him by others. It was not a question of how far the dangers surrounding the cotton in the yard were attributable to his negligence, how far to the unfortunate location of the yard, or how far they were unavoidable; enough that those dangers existed and made the yard an unsafe place to keep cotton in.

3. But it is urged that even though appellant was guilty of negligence in not shipping appellees' cotton by the Richardson, yet that his negligence was not the proximate cause of the loss, and therefore appellant is not liable therefor. There can nowhere in the whole range of law be found a more " tangled web " of conflicting opinions, subtle distinctions, and endless refinements than in the decisions of the various courts on the subject of proximate cause.

The leading cases that can be relied upon to sustain the view of appellant are *Morris* v. *Davis*, 20 Pa. 171 ; *Denny* v. *N. Y. Central R. R. Co.*, 13 Gray 481, and *R. R. Co.* v. *Reeves*, 10 Wall. 176. The principle of these cases cannot be more forcibly stated than is done in *Morrison* v. *Davis*, viz.: The general rule is that a man is answerable for the consequences of a fault only so far as the same may be natural and proximate, and as may on this account be foreseen by ordinary forecast, etc., while the leading cases that seem to take the opposite view are *Nathaniel Stevens* v. *Barton & Ms. R. R. Co.*, 1 Gray 277 (cited with approval by Judge Story—Story on Bailments) ; *Jeffersonville R. R. Co.* v. *Cotton*, 29 Ind. 498, and the English cases, *Davis* v. *Garrett*, 19 Eng. Com. L. Rep. 212, and the late case of *Royal Exchange Shipping Co.* v. *W. J. Dixon & Co.*, decided by the House of Lords.

How broadly this case differs from the above cases relied upon by appellant can be judged of by a momentary glance at them. In the first, and really the leading case, of *Morrison* v. *Davis*, the accident by flood to the canal boat was absolutely beyond human foresight as a result of the use of the lame mule, and at the outset of the trip, so far as human ken could tell, the misfortune was as apt to be expedited by having a sound mule as it was to be caused by the use of the lame one. So in the case in 13 Gray, so

far as was discernible at the time of the delay at Syracuse, that delay was as apt to serve to put the goods in the warehouse after the flood was over as it was to detain them just sufficiently long enough to encounter the flood.

There was absolutely nothing in these cases to warn the defendants that the subsequent disaster might be a consequence of their being derelict in the performance of their duty, and if there had been it is perfectly manifest from the reasoning of the cases that the decisions would have been different, for the whole force of the decisions is that the parties could by no human wisdom anticipate the consequences that ensued from their negligence. The difference between these cases and the one at bar is illustrated, it seems to me, by these supposed cases, viz.: in one case a man says to his servant, "I desire you to remove my horse from his present stable to my other one." The servant fails to do so, and that night lightning strikes the stable and the horse is killed. In the other he says to his servant, "The stable at which my horse is at present is very unsafe. I am afraid that it may fall down and kill him at any moment. I noticed that the supports to it are very rotten and liable to give way, and from appearance I fear a wind. I wish you to remove him this evening to my other stable." The servant fails to do so, the stable falls, the horse is killed. Admitting the plea that he could not foresee the consequences of his negligence to be good in the first case, still it must assuredly fail in the second. But in this case the very circumstances that made the act of nonshipment negligence were danger signals to warn him of the consequence of it. That which rendered it imperative for him to ship were the probable consequences of his not shipping.

4. If the appellant was guilty of negligence and that negligence was the cause of the loss, was he in any way shielded from the consequences of it by his shipping contract with the boats and the Georgia Pacific Railway Company? Under this contract the appellant occupied exactly the same position in regard to the other parties to it, so far as their right or power to control the cotton while in his custody, as if he had been an intermediate carrier; the three making a contract for their own convenience and benefit in

shipping and handling the cotton, the bill of lading telling each one of them who was the consignor and what was the destination of the cotton, and each being only answerable to the consignor for his conduct in regard to it.

*Leroy Percy* made an oral argument also.

COOPER, C. J., delivered the opinion of the court.

The appellees delivered to the Georgia Pacific Railroad Company certain cotton consigned to their commission merchants in the city of New Orleans. This cotton was carried under a through contract of affreightment, but the railroad was to deliver it to the appellant at Greenville at its cotton yard, and appellant was to deliver it to the steamer, by which the journey was to be completed. There was a contract between the railroad company, the appellant, and the steamers Helena and Choteau under which cotton from the interior was to be taken on through bills to New Orleans at a certain rate, of which the railroad received a certain sum, the appellant another, and the steamers the remainder. Where freights were not prepaid the railroad company on delivery to the appellant was paid by that company its freight, and when delivered by the appellant to the steamers they in turn repaid it the amount paid to the railroad company and also paid the sum due to appellant for its services, collecting from the consignee the total charges. Appellant is a warehouseman and forwarder, but not a common carrier. The steamers Helena and Choteau were due at Greenville on Saturday of each week, but they were frequently, if not usually, behind time, and it seems there was an agreement between the parties to the contract (the railroad company, the appellant, and the steamers) that cotton might be forwarded by other boats whenever the Helena or Choteau should be more than twenty-four hours late. Whether this modification of the contract was in force at the time of the loss of appellees' cotton is controverted, but for the purposes of this decision we will assume that it was.

Appellees' cotton was delivered by the railroad company to the appellant on Tuesday, the 22d day of December, 1885, and was

destroyed in its yard by fire on Tuesday, the 29th, and to recover the value of the same this suit was brought. It is conceded that the fire was non-negligent in its origin. It originated in an oil mill which for three weeks before that time had not been running, and from thence was communicated to the cotton yard by burning shingles from the mill carried by an unusually high wind, which chanced to be blowing from the direction of the mill toward and across the yard. The ground upon which liability is sought to be fixed upon appellant is that it was guilty of negligence in not shipping the cotton to New Orleans on Sunday, the 27th, by the steamer Richardson, which then passed down the river and would have taken it if it had been tendered for transportation.

The appellant interposed several defenses to the suit : first, that it had no opportunity of shipping out the cotton except that afforded by the Richardson, and this being on Sunday it was not bound to ship by that boat; second, that under its contract with the railroad company and the steamers Helena and Choteau it was justified in holding the cotton until the arrival of one of those boats ; third, that the railroad company was the agent of the plaintiff, and as such agent delivered the cotton upon an implied direction to hold for shipment by the Choteau or the Helena; fourth, that the railroad company knew the dangerous condition of the yard, and as agent of the shipper was guilty of contributory negligence in depositing the cotton in the yard; fifth, that there was no negligence in the detention of the cotton, and, sixth, that the loss was not occasioned by the detention but by an independent proximate cause, viz. : the burning of the oil mill.

On the trial it was shown that the yard of appellant was at the time of the reception of the cotton crowded with other cotton, much of which was not held for immediate shipment but was owned by purchasers who were in the habit of accumulating large lots before shipping out to Eastern mills. Much of this cotton had been sampled by cutting large slits in the sides of the bales, and the samples, when drawn, were placed upon the bales, rendering them peculiarly easy of ignition. The yard was a place of public sale, where cotton was carried and left until sold, where transactions of

sale were made, and many persons assembling there for that purpose were in the habit of smoking, though forbidden so to do by the rules of the company and by posted notices. The engines of the railroad were driven in and through the yard in delivering the cotton transported by it. There were several small houses occupied by negroes adjacent to the yard, and one house used by the company in which cottonseed was stored. It also appears that the defendant was accustomed to ship out cotton on Sunday, that being the day on which the boats patronized by it most frequently arrived or departed.

In view of this latter fact we think the defendant could not avoid any liability which otherwise would attach to it on the ground that it was not under a duty to violate the Sabbath. It is certain that it was not for this reason it refused to deliver the cotton to the Richardson, and that it would have shipped it by the Helena or the Choteau if either of them had arrived on that day.

By the laws of this State (Code of 1880, § 2949) the transaction of secular business on the Sabbath is prohibited and made penal, but the proviso to that section is " that nothing in this section shall apply to railroads or steamboat navigation in this State." The business in which appellant was engaged in reference to the property of the appellees was so intimately connected with that of steamboat navigation and so necessary to it as to fall within the exception of the proviso to the statute. We do not understand that a railroad company or a steamboat is bound to transact business on the Sabbath merely because the statute permits it to be done, but if they hold themselves out to the public as so doing and enter upon business which, according to their usages and habits, will be transacted on that day, they cannot shield themselves for either misfeasance or nonfeasance, because it was done or omitted to be done on the Sabbath.

We dissent from the proposition advanced by appellant that the railroad company, being the agent of the appellees to deliver the cotton and having knowledge of the condition of the cotton yard at the time the cotton was deposited therein, was guilty of con-

tributory negligence in depositing it there, and that the appellees, as the principal of the negligent agent, are also to be held guilty of such negligence; nor do we assent to the view that the railroad, as the agent of the shipper, selected the boats by which the cotton was to be transported. There is no fact disclosed by the record proving or tending to prove that appellees had any notice of the tripartite contract between the railroad, the appellant, and the steamers, under which they were accustomed to transport freights. By its contract the railroad company agreed with appellees to take their cotton at a stipulated price from the place of shipment to New Orleans, but was to be liable for losses only which might occur while the property was in its hands. The shippers had no interest in or knowledge of the contract it had made with other connecting carriers, but they had reasonable ground to believe and were justified in believing that the wharfboat company, to whom the cotton was to be delivered to be forwarded by the steamer, and the steamer by which it should afterward be carried would exercise that degree of care and prudence that the law devolved on them, and for a failure so to do would be responsible in damages. Under some circumstances it may be that a carrier is the agent of the shipper, but that relation does not exist under the contract here made to the extent claimed by the appellant. The contract was made between the railroad, for itself, the appellant, and the connecting carrier on the one part, and the shipper on the other. There is nothing in it from which can be inferred a power in the railroad as agent of the shipper to make a contract with the appellant which would relieve it from responsibility for its own negligence, or to bind the shipper by any contributory negligence of which the carrier railroad company might be guilty. The railroad company was bailee of the shipper until it should deliver the cotton according to its contract to the wharfboat company, which then in turn assumed that relation under the contract of shipment, and with the relation it also assumed the duties and responsibilities which flowed from it according to the character of business in which it was engaged. While the cotton was in the hands of the railroad, it was bailee with the responsibility of a common carrier.

When it reached the defendant it became bailee in turn, but only with the liability of a warehouseman, but this included responsibility for losses occurring by its neglect, against which the railroad had no authority to relieve it.   Hutchinson on Carriers, § 12.

It is conceded by the appellees that the defendant under ordinary circumstances would have performed its duty by holding the cotton until the arrival of the Helena or Choteau if either should arrive within a reasonable time, and that it is not the unvarying duty of a warehouseman and forwarder to ship by the first opportunity.   Their contention is that if by all the surrounding and accompanying facts and circumstances the warehousemen, as men of ordinary prudence, were admonished of the danger to which the property was exposed by reason of its liability to fire, it was appellants' duty to ship out the cotton by the first opportunity afforded, because to retain it in the yard endangered its safety.   That it was dangerous to permit it to remain they contend was an inference that the managers must have drawn from the fact that the yard was in a crowded condition; that much of the cotton had been sampled and the combustible cotton drawn from the bales scattered around where men were in the habit of smoking, and where the engines of the railroad ran in drawing their cars into the yard; that the adjacent cabins occupied by laborers and the seedhouse were sources from which accidental fires might be expected; that the oil mill and other buildings located within dangerous limits should also have been considered by the warehouseman, and if from all these danger from fire might reasonably have been feared, it was negligence to retain the cotton after the arrival of the Richardson.

We concur in the position thus assumed, and are of opinion that it was properly left to the jury to determine whether the defendants were guilty of negligence in failing to ship out the cotton by the opportunity afforded by the Richardson on Sunday; and this brings us to the final question in the cause.

The plaintiffs insist that a wrong-doer cannot apportion his own wrong, wherefore, since but for the negligent act of the defendant in failing to ship the cotton by the Richardson (which failure the

verdict of the jury was found to have been negligence), it could not have been destroyed by the fire, it is liable for the injury sustained ; or, in other words, that if the negligent act furnished the opportunity for the injury the defendant must respond in damages regardless of the immediate cause of the injury ; or, if mistaken in this, then the plaintiffs contend that if certain surrounding and attendant circumstances admonished the defendant that to retain the cotton would expose it to danger of fire from these sources, then if the fire did destroy it the defendant is liable even though it did not originate from those things which admonished of the danger, but occurred from a source from which no danger was or could have been reasonably apprehended.

It is contended for the defendant that if. it be conceded it was negligent in not shipping out the cotton, such negligence was the remote and not proximate cause of the loss, and *causa proxima non remota spectatur.*

It would be unprofitable to attempt an investigation of the very numerous, perplexing, and contradictory decisions which have been made upon this much vexed subject ; we have examined the cases cited by counsel, and find them to have been selected with discrimination and to fairly represent the conflicting views which prevail in different States. We have found no more intelligent and satisfactory deductions from the general course of decisions than the following propositions laid down by Mr. Cooley in his work on torts :

1. That in the case of any distinct legal wrong, which in itself constitutes an invasion of the right of another, the law will presume that some damage follows as a natural, necessary, and proximate result. Here the wrong itself fixes the right of action. We need not go further to show a right of recovery, though the extent of the recovery may depend upon the evidence.

2. When the act or omission complained of is not in itself a distinct wrong, and can only become a wrong to any particular individual through injurious consequences resulting therefrom, this consequence must not only be shown, but it must be so connected by averment and evidence with the act or omission as to

appear to have resulted therefrom according to the ordinary course of events, and as proximate result of a sufficient cause.

3. If the original act was wrongful, and would naturally, according to the ordinary course of events, prove injurious to some person or persons, and does actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing by those which are innocent; but if the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause and not to that which was more remote. Cooley on Torts 69.

We accept the second proposition, assuming that the words "according to the ordinary course of events" include not only those consequences which necessarily and invariably follow from known causes, but those which may and probably will follow.

The verdict of the jury has established for the purposes of this examination the fact that the circumstances existing at the time when the cotton might have been shipped from the yard were such as to warn the defendant it was dangerous to keep it there, and that it was guilty of negligence in so doing. If the fire had resulted from those circumstances which were relied on by the plaintiffs as indicating the danger to which the property was exposed, or either one of them, the defendant would have been responsible for the loss; but it does not follow that because the injury resulted from fire, and the defendant was admonished of danger from fire, it is to be held responsible. The inquiry returns, was it a fire from which a reasonably prudent man would have anticipated danger? To illustrate: if a bailee should deposit the goods of the bailor near the walls of a building which was toppling and threatening to fall, and the wall should fall and injure the property, he should be answerable, for it was his duty to have avoided the danger; but if the dangerous building do not fall, and another building, from which no danger could reasonably be anticipated, unexpectedly fall and injure the goods, here he is not answerable, though the injury has resulted from a like cause,

the falling of a wall, for the wall which fell, fell not according to the ordinary or probable course of events, but unexpectedly.

In *Morrison* v. *Davis*, 20 Pa. St. 171, a carrier by canal used a lame horse in pulling his boat, by reason of which it was delayed, and because of the delay it was subjected to a flood whereby the goods were injured. It was held that he was not liable for the reason that he could not foresee the danger. In *McGrew* v. *Stone*, 56 Pa. St. 440, the owner of a coal boat anchored in a dangerous part of the stream in the vicinity of many other boats; one of his boats was injured, and sinking, floated under the boat of plaintiff, which, upon the subsiding of the waters, settled upon it and was lost. It was held to be a question of fact to be decided by the jury whether, under all the circumstances, the defendant should have anticipated the probability of danger to the boat of the plaintiff, the court saying: "If he knew that barges filled with coal are ponderous, unwieldy, and difficult of control, are liable to injury and easily sunken, and that the place of mooring by reason of the strength of the current and floating drift was one of danger and most likely to cause such boats to sink, and also knew that this place in case of the sinking of his boat was likely to prove to be dangerous to some of the boats lying below, and that the flood would come—for it was his purpose to await its coming to carry him out—it could scarcely be held that these circumstances did not indicate to his mind the great danger of mooring there, and if an accident should happen there the danger to which it would expose others. The injury under such circumstances would not be so remote that it ought not to taken into account. But it must be observed that these are inferences of fact which belong to the jury, whose province it is to determine what are the circumstances and the inferences of probability to be drawn from them."

It is unnecessary to pass upon the numerous instructions given for the respective parties. What we have said will indicate sufficiently our view of the principles upon which the case ought to have been tried. If the danger of fire from the oil mill was such that a reasonably prudent man would have considered it as affording a reason for not keeping his own property in a yard located as was that of the

defendant, or if it was one of a number, and the surroundings taken as a whole, made up a danger from fire, originating in or proceeding from the mill, too great to make the keeping of the cotton the act of a prudent man, then, though there were other circumstances more calculated to awaken alarm from which the fire did not arise, the cause is not too remote to be considered. But if the mill was not a cause of reasonable apprehension of a fire so originating or proceeding, either of and by itself, or taken in connection with other surroundings, the defendant would not be responsible for the result of an unexpected fire originating therein merely because other and distinct circumstances from which no harm actually came admonished it of the danger of a fire.

In the court below the jury was in effect told that if the condition of the yard, the proximity of the cabins and the seed-house, the habit of smoking indulged in by those visiting the yard, and the fact that the engines ran into the yard, warned the defendant of the danger of fire, then if a fire occurred, though not originating from either of these sources, and though neither of these contributed to the loss, the defendant was responsible therefor. This is an erroneous view of the liability of the warehouseman, and imposed responsibility on him regardless of the fact that no danger could reasonably have been found from the source of the fire. Whether a fire from that source should have been anticipated by a reasonably prudent man was an inference to be drawn by the jury from all the facts in evidence.

<em>The judgment is reversed.</em>

